UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RALPH REDDING,

Petitioner,

-against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS,

Respondent.

------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

17 Civ. 7075 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Petitioner Ralph Redding ("Petitioner") brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his state court conviction following a jury trial in New York State County Court, Westchester County. (Docket No. 1).  Respondent opposed the Petition, (Docket No. 9), and Petitioner did not submit a reply.  For the reasons set forth below, I respectfully recommend that the petition for a writ of habeas corpus be denied in its entirety.

## I. BACKGROUND

### A. Crime

Petitioner's convictions arose from a home invasion at a New Rochelle residence. Construing the evidence in the light most favorable to the State, *see, e.g.*, *Murden v. Artuz*, 497 F.3d 178, 184 (2d Cir. 2007), the following facts were established at trial.

On December 14, 2010, at approximately 12:30 a.m., Petitioner, who was driving a black sedan near Hubert Place and North Avenue in New Rochelle, NY, stopped alongside Stephen

No objections to this Report and Recommendation (the "R&R") have been received, and no party has asked for an extension of time to object.  Accordingly, I review the R&R for plain error.  Finding none, I hereby adopt the R&R as the decision of the Court.  The Petition is dismissed.  Because reasonable jurists would not find it debatable that Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  The Clerk of Court is directed to send a copy of this endorsement to Petitioner, enter judgment for Defendant, and close the case.

SO ORDERED.

1

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

2/10/20

Wallace, an Iona College student, and called him over to the car. (Trial Tr.[1] at 830-38). Wallace walked over to Petitioner's car, stood within three feet of Petitioner, and looked inside to see him. (*Id.* at 836-38). Petitioner offered Wallace $10.00 to "grab" an empty pizza box from Canone's, a popular pizzeria located up the street, so he could play a trick on some girls. (*Id.* at 838-39, 851). Wallace agreed, and purchased an empty pizza box from Canone's for $1.00. (*Id.* at 839). Wallace then returned to Petitioner's car and handed him the box through the open window. (*Id.* at 839-40). Wallace was within "arm's length" of Petitioner's face and got a "good look." (*Id.* at 840).

A few minutes later, at approximately 12:40 a.m., Petitioner and his two accomplices, Sean Gray and Chad Jones, arrived at 43 Treno Street, New Rochelle, a three-story, single family house, where a group of Iona College students were gathered to watch a movie. (Trial Tr. at 607-09, 624, 648, 650, 728, 745, 863). The individuals in the home included John Havens and David Marcus, both of whom were tenants. (*Id.* at 607, 860, 875). The other students present were Christopher Boccio, Veronica Guzman, Jordan Ramos, and Gerilyn Carberry, who were all seated on a couch in the living room watching a movie. (*Id.* at 609). Marcus was in his room on the second floor of the house. (*Id.*).

Havens heard a knock on the door, and thought that Marcus had ordered food. (Trial Tr. at 625-27). Havens then looked out the window and saw Petitioner. (*Id.* at 627-29). He was holding a pizza box from Canone's, a popular pizza place that Havens knew well. (*Id.*). As Havens looked out the window, Petitioner looked at him and said, "pizza." (*Id.* at 628). When Havens opened the door, Petitioner pulled out a gun, and pushed through the door, followed by Gray and Jones. (*Id.* at 628-32). Petitioner pointed the gun at Haven's head, and directed the

---

[1] Refers to the transcript of Petitioner's trial, which commenced on October 31, 2011 and concluded on November 7, 2011.

others to put their cell phones on the table. (*Id.* at 634-36, 660, 735).  Petitioner demanded to

know, "where the fuck is Dave [Marcus] and where the fuck is the money." (*Id.* at 634, 735).

Concerned about everyone's safety, Havens took Petitioner to Marcus. (*Id.* at 636).  Petitioner

and Gray accompanied Havens upstairs with the gun to his head. (*Id.* at 636-37, 640, 675).

Although he was scared, Havens remained focused on the "faces [of the perpetrators] to make

sure because nobody was wearing a mask or anything, so [he] was observing what these people

were doing, what they looked like." (*Id.* at 644-45).

Meanwhile, Marcus was in his bedroom watching television and studying when he had

heard a "loud knock" downstairs, followed by a "commotion" and "panicked voices." (Trial Tr.

at 866-67).  After he got "frightened," Marcus closed his door, locked it, and attempted to call

911, but he was not connected. (*Id.* at 867).  Marcus then heard a "loud knock" on his bedroom

door. (*Id.*).  Outside of Marcus' bedroom, Petitioner told Havens, "you have ten seconds. If he

doesn't open his door, I'm going to blow your brains out." (*Id.* at 640).  Havens looked at

Petitioner, and then knocked on Marcus' door and said, "Dave, for my life, please open this

door." (*Id.* at 640, 676-77, 691).  Marcus opened the door; Petitioner rushed into the room and

put the gun to Marcus' throat as Gray pushed Havens down the staircase. (*Id.* at 640-41, 677,

691, 868-69, 894, 897, 902).  Marcus was standing face-to-face with Petitioner, about six inches

apart, "focusing on him" and his eyes. (*Id.* at 869-70, 894-96, 912).

Jones told Havens to "get the F down here," grabbed him, and had him stay on the couch

with the others. (Trial Tr. at 641-42, 677-78).  Meanwhile, Petitioner was still holding Marcus at

gunpoint upstairs, and demanded that Marcus "give [him] everything" he had. (*Id.* at 870).  Gray

searched the room and found a cash box containing $800. (*Id.* at 870, 897, 901).  Petitioner then

took Marcus into the hallway and pistol whipped him on the top of his head with the butt end of

the gun, causing him to fall to the ground. (*Id.* at 873-74).  As Petitioner and Gray ran down the

stairs, Petitioner pointed the gun at the others. (*Id.* at 642, 679-80, 683, 692, 738-39, 781-82).  As

soon as Petitioner, Gray, and Jones left, Havens and Boccio ran upstairs and found Marcus lying

in the hallway with his head bleeding. (*Id.* at 643-44, 740, 874).  The entire ordeal lasted

approximately three to five minutes. (*Id.* at 660. 736, 738, 761-62, 781, 804).  Throughout the

incident, Boccio and Guzman also observed Petitioner, and both got a clear view of his face on

more than one occasion. (*Id.* at 735-40, 751-53, 766, 778-81).

The police were called and commenced an investigation. (Collins Aff. [2] at 5).  During the

investigation, the police learned the identities of the perpetrators. (*Id.* at 5).  The police

conducted numerous photographic identification procedures with multiple witnesses, all of

whom identified Petitioner as the culprit. (*Id.*).  Marcus, Havens, Boccio, and Guzman each

identified Petitioner as the gunman. (Pre-Trial Hearing Tr. [3] at 19-20, 25-26, 32, 35-36).  Wallace

identified Petitioner as the man who requested the pizza box. (*Id.* at 40).

Petitioner and his two accomplices were arrested separately. (Collins Aff. at 6).

Petitioner was arrested on January 17, 2011. (*Id.* at 6).  Following grand jury presentations,

Petitioner was indicted and charged with the crimes of burglary in the first degree (two counts);

robbery in the first degree; robbery in the second degree; assault in the second degree (two

counts); and assault in the third degree. (Docket No. 9-1).  On March 9, 2011, Petitioner was

arraigned in New York State County Court, Westchester County, and entered a plea of not guilty.

(Collins Aff. at 6).  During the criminal proceedings, Petitioner was represented by assigned

counsel, David Rifas, Esq. (*Id.*).

---

[2] Refers to John M. Collins' Affidavit in Opposition to Petition for Writ of Habeas Corpus. (Docket No. 8).

[3] Refers to the transcript of Petitioner's Pre-Trial Hearing, held from October 17, 2011 through October 24, 2011.

**B. Pre-Trial Proceedings**

**1. Omnibus Motion**

Petitioner's defense attorney, David Rifas, filed an omnibus motion on May 5, 2011. (Docket No. 9-2).  In his counseled motion, Petitioner sought to, among other things, suppress the identification evidence against him on the ground that the procedures employed were suggestive. (*Id.* at 4-5).  In the alternative, Petitioner requested a *Wade*[4] hearing. (*Id.* at 5).  The State opposed the motion on May 20, 2011. (Docket No. 9-3).

By Decision and Order of the New York State County Court, Westchester County, the court denied Petitioner's motion to suppress the out-of-court identifications and/or prospective identification testimony. (Docket No. 9-4 at 6).  The court granted Petitioner a *Wade* hearing to determine whether any of the identification procedures employed were unlawful, unduly suggestive and/or conducive to irreparably mistaken identification. (*Id.* at 6-7).  The court further held that in the event that any of the identification procedures were found to be unduly suggestive, the prosecution would be required to set forth the independent source for any witness affected, so as to permit an in-court identification. (*Id.* at 7).

**2. *Wade* Hearing**

The court held a *Wade* hearing from October 17-19, 2011. (Pre-Trial Hearing Tr. at 1-363).  The following testimony was elicited from Detective Carpano, the sole witness to testify at the hearing.

On the night of the incident, Carpano met with Havens and Marcus at the New Rochelle Police Department (NRPD) headquarters. (Pre-Trial Hearing Tr. at 99-101, 174-76).  Havens described the gunman as a "large male, black, dark skin with scary eyes." (*Id.* at 99, 101, 177).

---

[4] *U.S. v. Wade*, 388 U.S. 218 (1967)

Marcus described the gunman as "six feet tall, 230 pounds, dark skin with a pudgy face," and stated that he "was wearing a black jacket and a beanie." (*Id.*). Marcus further stated that he was focused on the gunman's "scary, evil eyes." (*Id.* at 113-14, 174). Throughout the investigation, Carpano told Havens and Marcus not to discuss the details of the investigation with anyone. (*Id.* at 115, 157-58, 170).

The police received an anonymous tip that a person by the name of "KO", later identified as Petitioner, was involved in the home invasion. (Pre-Trial Hearing Tr. at 178-79). Detective Fudge, who was familiar with Petitioner, also identified Petitioner as a suspect based on the witnesses' description of the gunman, especially the statement that he had "scary, evil eyes." (*Id.* at 135, 137, 141, 174-76).

On December 20, 2010, Carpano met with Marcus and Boccio at the NRPD headquarters to conduct identification procedures. (Pre-Trial Hearing Tr. at 14, 18, 21, 121-25). The two witnesses were separated throughout the procedures. (*Id.* at 21, 25, 47, 149). Carpano showed each witness a different set of photographs; each contained eleven photographs of different black males of similar age, skin tone, and features. (*Id.* at 17-24). Carpano was particularly focused on "the eyes," because "on several occasions, the victims in this case" referred to the "slant of the eyes." (*Id.* at 17). The same photographs were included in each set of photo packets, with Petitioner's photograph being the fifth one in each packet. (*Id.* 20, 26). Carpano, together with the NRPD Detectives Messina and Fudge, prepared the photo packets using arrest booking photographs. (*Id.* at 17-18, 22-23, 31). Petitioner's photograph was the only one in the packet to have a white, or light, background, as compared to the others, which had darker backgrounds of charcoal. (*Id.* at 144-45, 153, 164).

Before conducting the identification procedures, Carpano instructed Boccio and Marcus that they were going to view "various photographs, that the person involved in the crime may or may not be included among the photographs [they] were about to view and that [they] should not feel pressure to make any identifications." (Pre-Trial Hearing Tr. at 148).  During the identification procedures with Boccio and Marcus, respectively, Carpano placed the photographs face down in front of the witnesses and told them to turn the photographs over sequentially and to start viewing them one by one. (*Id.* at 19-20, 25-26).  Both Boccio and Marcus identified Petitioner as the gunman. (*Id.*).  On the back of Petitioner's photograph, Boccio signed his name and wrote "this is the guy that was holding the gun when entering the house at 43 Treno Street that robbed my friend David Marcus on Tuesday, 14, December 2010." (*Id.* at 20).  Marcus wrote, "this is the man that held me at gun point and robbed me, then struck me on the head with a revolver and stole $800, Tuesday, the 14th, at 12:45 a.m." (*Id.* at 26).  Carpano testified that after completing the identification procedures, either Marcus or Havens said that they would "never forget those eyes." (*Id.* at 177).

On January 6, 2011, Carpano met with Havens, Carberry, and again with Marcus at the NRPD headquarters. (Pre-Trial Hearing Tr. at 28).  Carpano told them, just as he told the other witnesses, that the individual(s) responsible for the crime may or may not be included in the photo array, and that they should not feel obligated to make any identifications. (*Id.* at 29).  Carpano then placed the three witnesses in separate offices. (*Id.*).

Carpano showed Havens a photo packet consisting of 13 photographs in the same format as the packet that was given to the other witnesses, with two additional photographs. (Pre-Trial Hearing Tr. at 30-31, 161-62).  The sequence of the photographs was also changed, with Petitioner's photo being the ninth in the packet. (*Id.*).  Two of the photographs, including

Petitioner's, had white backgrounds, while all the other photographs had charcoal shades. (*Id.* at 163). Employing the same procedures that took place with the other witnesses, Carpano asked Havens to turn over each photograph. (*Id.* at 32). Havens identified the Petitioner in photograph number nine as "the one with the gun who forced me to bring him to Dave Marcus's room on December 14, 2010 at around 12:40 a.m. at my home, 43 Treno Street, New Rochelle." (*Id.*). Carberry could not identify the Petitioner because she remained downstairs and "the only person she had the best look at would have been the one that stayed there with them." (*Id.* at 168).

On January 19, 2011, Carpano met with Guzman alone at the NRPD headquarters. (Pre-Trial Hearing Tr. at 33, 181). Carpano and Messina compiled a separate photo packet containing eight photographs for Guzman to view. (*Id.* at 33-34). The photo packet was in the same format as the photo packets shown to the other witnesses; it contained photographs of black males of similar age, skin tone and facial features, particularly the eyes. (*Id.* at 33-35). The photos contained a mix of arrest booking photographs and MySpace pictures. (*Id.* at 34). Petitioner's photograph was fifth sequentially. (*Id.* at 35). Carpano gave Guzman the same instructions that he had given to all other witnesses with respect to the identification procedure. (*Id.* at 36). Guzman then "positively identified [Petitioner] in photo number five as the person who walked in with the handgun on the date and time and location of this occurrence." (*Id.*).

On January 27, 2011, Carpano met with Wallace at the NRPD headquarters. (Pre-Trial Hearing Tr. at 37). Carpano handed Wallace an individually prepared photo packet containing eight photographs of similar looking black males. (*Id.* at 39). Carpano used the same procedures in preparing this photo packet and gave Wallace the same instructions as the others. (*Id.* at 39-40). Seven out of the eight pictures were obtained from MySpace accounts, while Petitioner's

picture was an arrest booking photograph. (*Id.* at 339-41).  Wallace identified Petitioner as the person who offered him money to obtain an empty pizza box. (*Id.* at 39-40, 190).

The court ruled that the photographic identifications by Marcus, Boccio, Havens, and Guzman were not suggestive. (Pre-Trial Hearing Tr. at 315, 332, 337).  Specifically, the court found that each of the witnesses arrived at police headquarters voluntarily, and were appropriately separated before any identification procedures were conducted. (*Id.* at 312-13, 315).  The court concluded that the witnesses were duly "given neutral advisement with respect to whether or not there would be a suspect and whether or not they had some obligation to identify." (*Id.* at 315).  The court further found that there was no evidence of collusion among the witnesses with respect to the identifications since there was "no pressure to put on [them] to identify any specific person and the instruction[s] to them were clear that they were not to discuss anything among themselves." (*Id.* at 315-17).

The court also held that there was no constitutional infirmity in the photo arrays with respect to the white fillers used in Petitioner's photographs. (Pre-Trial Hearing Tr. at 319-27).  The court found that, although the photo packets used for Marcus, Boccio, and Havens contained a white background in Petitioner's photo that highlighted him in a certain manner, "other elements of the other pictures in the array highlight those particular individuals when viewed in a sequence or as a category or group of photographs viewed one after the other." (*Id.* at 323-27).  The court next found that any significance attached to the fact that Petitioner's photograph was positioned fifth in the packets shown to both Marcus and Boccio was "negated by the fact that neither witness saw the other viewing that particular [photo]," and also because the sequence of fillers in each packet were mixed. (*Id.* at 324-25).  The court next found that any significance of the light background in the photo packet shown to Havens was even more diminished by the fact

that the packet contained two additional filler photographs with a different photographic

sequence. (*Id.* at 326-27).

With respect to the packet viewed by Guzman, the court found that the MySpace pictures

mixed with booking pictures was not significant since the photos contained no identifying marks,

and were "not different to the point where it makes it suggestive." (Pre-Trial Hearing Tr. at 333-

36). The court further concluded that the fact that Petitioner's photograph was also fifth

sequentially was of no moment since Guzman made his identification long after the other

witnesses made their identifications. (*Id.* at 337).

Lastly, the court found that the photo packet used in Wallace's identification of Petitioner

was tainted because it contained Petitioner's arrest booking photograph, while all of the other

photographs were "MySpace type photographs." (Pre-Trial Hearing Tr. at 338-41). The court

thus ordered an independent source hearing with respect to Wallace's identification of Petitioner.

(*Id.*).

### 3. Independent Source Hearing

The court held the independent source hearing on October 24, 2011. (Pre-Trial Hearing

Tr. at 363-410). Wallace testified that the area where he first saw Petitioner was well lit, and that

he could see Petitioner in the front seat of his black sedan throughout their entire exchange on

December 14, 2010 between 11:00 p.m. and 12:00 a.m. (*Id.* at 368-75, 384, 400). Wallace

further testified that he was confident that the person he identified to the police on January 27,

2011 was the same person he saw in the car on the evening of the home invasion. (*Id.* at 376,

401). Accordingly, the court found that there was an independent source. (*Id.* at 410-12).

### 4. Motion for Identification Expert

Petitioner filed a counseled motion for an identification expert, dated August 25,

2011, which sought to admit expert testimony at trial on eyewitness misidentification. (Docket No. 9-5). Petitioner proffered to admit testimony by Steven D. Penrod, J.D., PhD concerning factors that contribute to misidentification. (*Id.*). Specifically, Petitioner requested that Dr. Penrod be permitted to testify as to the topics of: "1) cross racial bias; 2) weapon focus; 3) stress; 4) line-up or photo array fairness; 5) unconscious transference." (*Id*. at 4). Petitioner also requested that Dr. Penrod be permitted to testify "without a *Frye*[5] inquiry being made." (*Id.* at 7-10). The State opposed the motion on September 15, 2011. (Docket No. 9-6).

The court heard extensive oral argument on the motion at both pretrial hearings and at trial. (Pre-Trial Hearing Tr. at 4-9, 105-09, 357-63, 471-82, Trial Tr. at 537-66, 920-58). Petitioner maintained that an identification expert was appropriate in this case because there was no forensic evidence, and eyewitness identification in the face of stressful and life-threatening situations is inherently unreliable. (Trial Tr. at 539, 920-23, 941). Petitioner cited the following factors in support of his argument -- the "stranger on stranger" aspect of the case, "weapons focus," "cross-race identification," alleged witness collusion, incident duration, and the alleged inability of the witnesses to see the gunman's entire face. (*Id.* at 540, 542, 921-24, 932-33, 936-38, 941).

The court denied the motion on the ground that there was sufficient corroborating evidence in the identification of Petitioner to obviate the need for an expert. (Trial Tr. at 946-58). Specifically, the court found that five eyewitnesses had positively identified Petitioner as the perpetrator. (*Id.* at 476-77, 541, 546, 559, 939-41, 946-58). The court concluded that the witnesses had the opportunity to view Petitioner with a "perfect vantage point" and for a "substantial" duration, (*id.* at 928-30, 933), that the witnesses who spoke to Petitioner "face-to-

---

[5] *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923).

face" essentially "had a ring side seat to the events that were occurring," (*id.* at 929), that the "lighting conditions were as good as they are ever going to get," and that Petitioner's face was not covered. (*Id.* at 956). The court further held that with respect to their identification of Petitioner, there was "absolutely no evidence" of collusion among the witnesses. (*Id.* at 936). The court also considered the evidence relating to the pizza box that Wallace obtained for Petitioner. (*Id.* at 545-46, 559, 953-56). In sum, the court stated that "the identifications of the defendant are strong … this is as strong an ID case as I have ever seen." (*Id.* at 958).

## C. Trial and Verdict

The court held jury selection from October 24, 2011 through October 28, 2011 for the consolidated trial of Petitioner and Gray.[6] (Trial Tr. at 1-513). The jury trial was held from October 31, 2011 through November 7, 2011. (*Id.* at 571-1153). Several individuals testified for the prosecution, including Havens, Boccio, Guzman, Marcus, Wallace, Officer Francis Flanigan, and Detective Robert Barber. Petitioner and his cousin, Kashiem Johnson, were the only two witnesses for the defense. (*Id.* at 990, 1004).

Five witnesses positively identified Petitioner as the perpetrator. Havens, Boccio, and Guzman all identified Petitioner as the gunman who entered the house carrying an empty Canone's pizza box and held a gun to Haven's head. (Trial Tr. at 631, 644-45, 741, 776, 779). Marcus testified that Petitioner held a gun to him and pistol whipped him and that Gray stole his money. (*Id.* at 868-72). Wallace testified that Petitioner asked him to procure the empty pizza box from Canone's. (*Id.* at 837).

---

[6] On October 31, 2011, Gray entered a plea of guilty to robbery in the second degree in full satisfaction of all charges. Gray admitted that "on or about December 14, 2010, being aided and abetted and acting in concert with Ralph Redding and Chad Jones and each being actually present, [he], along with the others, did forcibly steal property." (Collins Aff. at 6, footnote 4).

Officer Francis Flanigan, one of the first officers to respond to the scene, testified that the porch light was on and that none of the students appeared to have been drinking or smoking. (Trial Tr. at 720-22). Detective Barber, an expert in "latent fingerprinting," testified that on February 8, 2011, Detective Carpano brought him the Canone's pizza box for testing and analysis. (*Id.* at 824-45). Barber testified that although no prints were recovered from the box, this was not unusual under the circumstances.[7] (*Id.* at 826).

Petitioner denied any involvement with the robbery. (Trial Tr. at 1014). He testified that, among other things, he was at his Aunt Wendy's house in Long Island with his cousin, Johnson, on the night of December 13, 2010 and early morning of December 14, 2010. (*Id.* at 1011). Petitioner also denied having ever been on Treno Street in New Rochelle, or that he had ever met, and did not know, Havens, Marcus, Guzman, or Boccio. (*Id.* at 1012-13). Johnson testified that Petitioner was with him on Long Island on the night of the incident, and that Petitioner did not have access to a car that evening. (*Id.* at 985-88).

On November 7, 2011, the jury convicted Petitioner on the charges of burglary in the first degree (two counts); robbery in the first degree; robbery in the second degree; assault in the second degree (two counts); and assault in the third degree. (Trial Tr. at 1151-52).

## D. Sentencing

On February 23, 2012, Petitioner was sentenced to the following concurrent terms of imprisonment: twelve years determinate for each of his convictions of burglary in the first degree (two counts); twelve years determinate for his convictions of robbery in the first degree; ten

---

[7] Barber explained that the ability to extract latent fingerprints is dependent on a number of factors, including surface texture, skin type, the amount of pressure applied, and temperature. (*Id.* at 820-22, 826). Barber explained that the individuals who came into contact with the pizza box "may not have been secretors so they may not have left anything behind when they touched the box." (*Id*. at 826).

years determinate for his conviction of robbery in the second degree; seven years determinate for each of his convictions of assault in the second degree (two counts); and one year local imprisonment for his conviction of assault in the third degree. (Sentencing Tr.[8] at 14-15).

## E. Motions to Vacate the Judgment and to Set Aside the Sentence

### 1. N.Y. C.P.L. § 330.30 Motion

Prior to sentencing, Petitioner submitted a counseled motion to set aside the verdict pursuant to N.Y. C.P.L. § 330.30. (Docket No. 9-7). The motion was based upon an affidavit from Gray, Petitioner's co-defendant, in which Gray stated that Petitioner did not participate in the home invasion. (*Id.*). The State opposed the motion. (Docket No. 9-8).

By Decision and Order, dated February 29, 2012, the court denied the motion. (Docket No. 9-47). The court held that the affidavit was "purportedly prepared some six months prior to trial," and that Petitioner "provide[d] no explanation as to why this information could not have been discovered prior to trial with due diligence." (*Id.* at 2-3).[9] Accordingly, the court found that the affidavit could not be considered "newly discovered evidence" sufficient to warrant relief under N.Y. C.P.L. § 330.30. (*Id.* at 2). The court held that "[i]n view of the overwhelming evidence at trial—including the unequivocal identification of the defendant by the complainant—it is improbable that the defendant would receive a more favorable verdict upon a re-trial." (*Id.* at 3).

---

[8] Refers to the transcript of Petitioner's Sentencing, held on February 23, 2012.

[9] The court also noted that Gray had "pleaded guilty after jury selection was completed, specifically implicating the defendant in the crime." (Docket No. 9-47 at 1).

**2. N.Y. C.P.L. § 440.10 Motion**

Petitioner filed a counseled motion to set aside the verdict pursuant to N.Y. C.P.L §

440.10 ("440 Motion"), dated July 3, 2013. (Docket No. 9-9).  The State opposed the motion, by

papers dated September 5, 2013. (Docket No. 9-10).  Petitioner filed a counseled reply in further

support of his 440 Motion, dated October 14, 2013. (Docket No. 9-11– 9-35).  Petitioner argued,

in relevant part, that the photo arrays utilized by the NRPD were unduly suggestive. (Docket No.

9-11 at 6-7).  The State filed a sur-reply in further opposition to Petitioner's 440 Motion, dated

November 25, 2013. (Docket No. 9-36).  Petitioner also raised a multitude of other claims, such

as *Brady*[10] violations and ineffective assistance of counsel. (*See* Docket Nos. 9-9, 9-11).

By Decision and Order, dated March 26, 2014, the New York State County Court,

Westchester County, summarily denied Petitioner's 440 Motion as procedurally barred and

without merit. (Docket No. 9-37).  The court found, in relevant part, that Petitioner's claim that

the photo arrays were unduly suggestive were record-based, and therefore not cognizable on a

440 Motion. (*Id*. at 12).  On June 13, 2014, the State of New York, Appellate Division, Second

Judicial Department ("Second Department") granted Petitioner leave to appeal the state court's

denial of his 440 Motion. *See People v. Redding*, No. 2014-04520, 2014 NY Slip Op. 75103 (U)

(2d Dep't 2014).

**F.  Direct Appeal**

On June 16, 2014, the Second Department granted Petitioner's application to consolidate

his direct appeal from his judgment of conviction with his appeal from the state court's denial of

his 440 Motion. *See People v. Redding*, No. 2012-02646, 2014 NY Slip Op. 75211 (U) (2d Dep't

2014).  Carl F. Berman, Esq. was assigned to represent Petitioner on his appeal. (Collins Aff. at

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

26).  Petitioner submitted his counselled appellate brief on December 11, 2014. (Docket Nos. 9-38, 9-39).  Petitioner asserted, in relevant part, that he was denied a fair trial because the jury heard unreliable eyewitness identification testimony, and that the trial court erred in precluding his proposed expert on the subject without first holding a *Frye* hearing. (Docket No. 9-38 at 23).  Petitioner also claimed that the trial court erred in failing to suppress identification testimony given the suggestiveness of the photographic arrays that violated best practice standards. (*Id*. at 38).  Petitioner raised a number of other claims, including ineffective assistance of counsel and *Brady* violations. (*See* Docket Nos. 9-38, 9-39).  The State opposed the appeal by papers dated March 24, 2015. (Docket Nos. 9-40, 9-41).  Petitioner filed a reply brief on April 29, 2015. (Docket No. 9-42).

The Second Department denied Petitioner's consolidated appeal in its entirety on October 7, 2015. *See People v. Redding*, 132 A.D.3d 700 (2d Dep't 2015).  The court held, in relevant part, that the trial court properly denied Petitioner's omnibus motion that sought to suppress the identification testimony on the basis of suggestive photographic arrays. *Id.* at 700.  Despite the lighter background and the poorer resolution of the photo arrays, the court found the arrays were not suggestive since "the various persons depicted in the photo packets . . . were sufficiently similar in appearance to [Petitioner] that there was little likelihood [Petitioner] would be singled out for identification based on particular characteristics. *Id.* at 700-01.  The court also concluded that the trial court properly precluded Petitioner's expert witness testimony "on the issue of reliability of eyewitness identifications since there was sufficient corroborating evidence connecting the defendant to the crimes to obviate the need for expert testimony." *Id.*

On November 6, 2015, Petitioner sought leave to appeal the Second Department's decision to the New York State Court of Appeals ("Court of Appeals"). (Docket No. 9-43).  In

his leave application, Petitioner asserted that the trial court and Second Department violated his right to present a defense. (*Id*. at 3).  Specifically, Petitioner argued that the courts improperly applied a "cross-corroboration" exception to the first prong in *People v. LeGrand*, 8 N.Y.3d 449 (2006).[11] (*Id*. at 1-5).  Petitioner also argued that New York should adopt the more "liberal" approach" for the admission of scientific expert testimony set forth in *Daubert*.[12] (*Id*. at 6-7).  Lastly, Petitioner took issue with the "unduly suggestive standard" used by New York courts in evaluating *Wade* suppression motions. (*Id.* at 8).  The State opposed Petitioner's leave application, by papers dated December 15, 2015. (Docket No. 9-44).  On April 14, 2016, the Court of Appeals denied Petitioner's leave application. *See People v. Redding*, 27 N.Y.3d 1005 (2016).

On July 12, 2016, Petitioner filed a petition for writ of certiorari to the United States Supreme Court, (Docket No. 9-45), raising two questions for review:

1)  In light of the scientific consensus regarding the unreliability of many police-devised photo identification procedures, do the Sixth and Fourteenth Amendments to the Constitution of the United States protect the right of a criminal defendant to present scientific expert testimony on this issue at trials where the evidence against the defendant is derived from a police-devised photo identification procedure that violates forensic culprit identification best practices?

2)  As a corollary to the above, is it appropriate for the Supreme Court to re-examine the rule of *Mason v. Braithwaite*, 432 U.S. 98 (1970) and to adopt a more vigorous test to the reliability of identification testimony that takes into account advances in the forensic science of culprit identification including best practices for police-devised photo identification procedures?

---

[11] *LeGrand* held that "where the case turns on the accuracy of eyewitness identification and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identification if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror." 8 N.Y.3d at 452.

[12] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

(*Id.* at 6).  The United States Supreme Court denied the petition for writ of certiorari. *See Redding v. New York*, 137 S.Ct. 208 (2016).

## G.  Federal Habeas Corpus Proceeding

Petitioner filed the instant habeas corpus petition ("Petition") on September 11, 2017.[13] (Docket No. 1).  Respondent filed an opposition ("Opposition") to the Petition by papers dated December 11, 2017. (Docket No. 9).  Petitioner did not submit a reply in further support of his Petition.

## II.  APPLICABLE LAW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  "Before a federal district court may review the merits of a state court criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Visich v. Walsh*, No. 10 Civ. 4160 (ER) (PED), 2013 WL 3388953, at *9 (S.D.N.Y. July 3, 2013).[14]  The procedural and substantive standards are summarized below.

---

[13] A *pro se* prisoner's papers are deemed filed at the time he or she delivers them to prison authorities for forwarding to the court clerk. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *see also Walker v. Jastremski*, 430 F.3d 560 (2d Cir. 2005) (analyzing the *Houston* "prison mailbox rule").  Petitioner certifies that he delivered his Petition to prison authorities for mailing on September 11, 2017. (Petition at 15).  Respondent does not appear to challenge that date or levy any challenges as to the timeliness of the Petition.  Accordingly, unless otherwise noted, the Court adopts Petitioner's dates for this filing and for all other filings discussed herein.

[14] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and other cases, *infra*, that are unpublished or only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Petitioner.

## A. Timeliness Requirement

Federal habeas corpus petitions are subject to AEDPA's strict, one-year statute of limitations. 28 U.S.C. § 2244(d)(1).  The statute allows for four different potential starting points to determine the limitations period and states that the latest of these shall apply.  As the statute explains:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  However, this one-year period will be tolled during the pendency of a properly filed application for post-conviction relief. 28 U.S.C. § 2244(d)(2).  This period may also be subject to equitable tolling, but "only in the rare and exceptional circumstance." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (internal quotation marks omitted); *see also Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (setting forth a two-step analysis for equitable tolling).

## B. Exhaustion as a Procedural Bar

A habeas petition may not be granted unless the petitioner has exhausted his claims in state court. *See* 28 U.S.C. § 2254(b).  As the statute prescribes:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-

> (A) the applicant has exhausted the remedies available in the courts of the State; or

> (B)(i) there is an absence of available State corrective process; or

> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

> . . .

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).

Exhaustion requires a prisoner to have "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (internal quotation marks omitted).  If a petitioner "cites to specific provisions of the U.S. Constitution in his state court brief, the petitioner has fairly presented his constitutional claim to the state court." *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001); *see also Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (even "a minimal reference to the Fourteenth Amendment" presents a federal constitutional claim to the state courts). However, a petitioner may fairly present his claim even without citing to the U.S. Constitution. As the Second Circuit has stated:

> the ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982).  Fair presentation

includes petitioning for discretionary review in the state's highest appellate court. *See O'Sullivan*

*v. Boerckel*, 526 U.S. 838, 839–40 (1999) ("[A] state prisoner must present his claims to a state

supreme court in a petition for discretionary review in order to satisfy the exhaustion

requirement[.]").

 However, "a federal habeas court need not require that a federal claim be presented to a

state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v.*

*Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation marks omitted).  In such cases,

although the claim is technically unexhausted, the district court may deem the claim to be

exhausted but procedurally barred from habeas review. *See id.* at 140 ("[A] claim is procedurally

defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state

remedies and the court to which the petitioner would be required to present his claims in order to

meet the exhaustion requirement would now find the claims procedurally barred.'" (quoting

*Coleman v. Thompson*, 501 U.S. 722, 735 (1991)).

 Under New York law, defendants are permitted only one direct appeal. *See Dasney v.*

*People of the State of New York*, No. 15 Civ. 5734 (RJS), 2017 WL 253488, at *5 (S.D.N.Y. Jan.

19, 2017) (citing N.Y. Ct. App. R. § 500.20);[15] *see also Roa v. Portuondo*, 548 F.Supp.2d 56, 78

(S.D.N.Y. 2008) ("Any attempt to raise these claims at this stage as part of a direct appeal would

be rejected because a criminal defendant is entitled to only one direct appeal and one application

for leave to appeal to the Court of Appeals.").  Petitioners must raise record-based claims by

direct appeal rather than by a collateral motion in state court. *See, e.g.*, *O'Kane v. Kirkpatrick*,

---

[15] This rule states, in relevant part, that a letter application for leave to appeal "shall indicate . . . (2) that no application for the same relief has been addressed to a justice of the Appellate Division, as *only one application is available.*" N.Y. Ct. App. R. 500.20(a) (emphasis added).

No. 09 Civ. 05167 (HB)(THK), 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("[A]ll claims that are record-based must be raised in a direct appeal. . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10."), *report and recommendation adopted*, 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011); *Lowman v. New York*, No. 09 Civ. 0058T, 2011 WL 90996, at *9 (W.D.N.Y. Jan. 11, 2011) ("Collateral review of this claim—by way of another CPL § 440 motion—is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not.)" (citing N.Y. C.P.L. § 440.10(2)(c)).[16]

To avoid the procedural default of an unexhausted claim, a petitioner may show "cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice, *i.e.*, the petitioner is actually innocent." *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

## C.  Adequate and Independent State Grounds as a Procedural Bar

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729); *see also Downs v. Lape*, 657 F.3d 97, 23 (2d Cir. 2011).  This preclusion applies even if the state court alternatively rules on the merits of the federal claim, so long as there is an adequate and independent state ground that would bar

---

[16] N.Y. C.P.L. § 440.10(2)(c) states, in relevant part, that a court must deny a § 440.10 motion to vacate judgment when "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."

the claim in state court. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999).

"A state court decision will be 'independent' when it 'fairly appears' to rest primarily on state law." *Taylor v. Connelly*, 18 F. Supp. 3d 242, 253 (E.D.N.Y. 2014) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)). In the normal case, a ground is adequate "only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia*, 188 F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003). A decision that a state procedural rule is inadequate should not be made "lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (internal quotation marks omitted). However, "there are 'exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.'" *Cotto*, 331 F.3d at 240 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)). In determining whether a case is "exceptional" in that the state ground should be held inadequate, the Second Circuit uses the following factors as "guideposts":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (internal quotation marks omitted).

To avoid a procedural default based on independent and adequate state grounds, a petitioner must "show 'cause' for the default and 'prejudice attributable thereto,' . . . or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris*, 489 U.S. at 262 (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

### D.  AEDPA Standard of Review

When a federal court reaches the merits of a habeas petition, AEDPA prescribes a

"highly deferential" standard for reviewing state court rulings. *Lindh v. Murphy*, 521 U.S. 320,

333 n.7 (1997); *see also Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015).  An application for a

writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination
> > of the facts in light of the evidence presented in the State court
> > proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Courts have interpreted the phrase "adjudicated on the merits" in AEDPA as meaning

that a state court "(1) dispose[d] of the claim on the merits, and (2) reduce[d] its disposition to

judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (internal quotation marks

omitted).  Courts examine the "last reasoned decision" by the state courts in determining whether

a federal claim was adjudicated on the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

orders upholding that judgment or rejecting the same claim rest upon the same ground.").

"[W]hen a state court issues an order that summarily rejects without discussion *all* the claims

raised by a defendant, including a federal claim that the defendant subsequently presses in a

federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the

federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 293 (2013)

(emphasis in original).  The same presumption applies when "a state court rules against the

defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question." *Id*. at 292.  This "presumption is a strong one that may be rebutted only in unusual circumstances." *Id.* at 302.

If a state court adjudicates a federal claim on the merits, the Court must apply AEDPA deference to that state court ruling.[17] 28 U.S.C. § 2254(d)(1)-(2).  In the context of AEDPA deference, the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme Court of the United States'] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  "A state court decision is contrary to such clearly established federal law if it 'applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent.'" *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001)).

A state court decision involves an "unreasonable application" of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than "incorrect or erroneous" -- it must have been "objectively unreasonable."

---

[17] If, by contrast, a state court does not adjudicate a federal claim on the merits, "AEDPA deference is not required … [and] conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." *DeBerry v. Portuondo*, 403 F.3d 57, 66-67 (2d Cir. 2005).

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)).  However, "the trial court's decision need not teeter on 'judicial incompetence' to warrant relief under § 2254(d)." *Alvarez v. Ercole*, 763 F.3d 223, 229 (2d Cir. 2014) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).  If a state court decision does not contain reasons for the dismissal of a defendant's federal claim, the Court must "consider 'what arguments or theories . . . could have supported[] the state court's decision,' and may grant habeas only if 'fair-minded jurists could [not] disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Lynch v. Superintendent Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (alterations in original) (quoting *Richter*, 562 U.S. at 102).

## III. DISCUSSION

Construing the Petition broadly, the Court finds that Petitioner asserts three grounds for relief. *See William v. Kullman*, 722 F.3d 1048, 1051 (2d Cir. 1983) ("pleading requirements in habeas proceedings should not be overly technical and stringent.").  First, Petitioner claims that the trial court violated his right to present a defense under the Sixth Amendment when it denied his motion to offer expert testimony on misidentification. (Petition at 5).  Second, Petitioner asserts that the *Frye* standard for the admission of scientific expert testimony is violative of his right to present evidence, and that it should be replaced with the standard set forth in *Daubert*. (*Id.* at 7).  Third, Petitioner claims actual innocence. (*Id.*).

For the reasons that follow, I respectfully recommend that the Petition be denied in its entirety.

## A.  The Right to Present a Defense Under the Sixth Amendment

Petitioner claims that the trial court violated his Sixth Amendment right to present a defense when it denied his motion to offer expert testimony from Dr. Penrod regarding the photo array. (Petition at 5).  Petitioner maintains that the photo array presented at trial was "biased" because his photo was the only one that had a white background, making his "face stand out." (*Id.*).  Petitioner argues that an expert witness would have confirmed that the photo array was, in fact, biased. (*Id.*).  The Court finds that this claim is unexhausted and procedurally barred. Furthermore, even if this claim were exhausted, it still fails on the merits.

### 1.  Petitioner's Claim is Unexhausted

Respondent argues that this claim is unexhausted and procedurally barred from review because Petitioner did not present it to the highest court in the state. (Docket No. 9 at 9-10).  The Court agrees with Respondent.  Although Petitioner referenced violations of "the right of the defense to present a defense" in his leave application to the Court of Appeals, (Docket No. 9-43 at 3), he did not address the constitutional right to present a defense under the Sixth Amendment in his appellate brief to the Second Department.  Rather, Petitioner claimed that he was denied a fair trial because the jury heard unreliable eyewitness testimony, and that it was improper for the court to deny his expert testimony on the subject. (Docket No. 9-38 at 27).  Petitioner presented this claim in terms of New York state evidentiary law on a trial court's discretion in admitting expert testimony on eyewitness identification. (*Id.* at 27-42).  Petitioner's appellate brief thus failed to assert the claim in terms so particular to call to mind a specific right protected by the Constitution or allege a pattern of facts that is well within the mainstream of constitutional litigation. *See Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d at 194; *see also Young v. Conway*, 761 F. Supp. 2d 59, 78 (W.D.N.Y. 2011) (which held that petitioner's claim that he was deprived

his constitutional right to present a defense was not exhausted because in his appellate brief, petitioner cited only to state cases that "did not employ any constitutional analyses, instead holding that the use of expert testimony regarding identification is a matter for the trial court's discretion, and that abuse of discretion may be erroneous as a matter of law.").

Further, "[i]t would be futile to dismiss [this] claim[] without prejudice to allow [Petitioner] to exhaust [the claim] because he is barred from doing so under state law, either on direct review or by collateral attack." *Parrish v. Lee*, No. 10-CV-8708, 2015 WL 7302762, at *16 (S.D.N.Y. Nov. 18, 2015).  Petitioner is only entitled to one direct appeal, *see* N.Y. Ct. R. 500.20 (a)(2), and cannot raise this issue in another C.P.L. § 440.10 motion to vacate the judgment. *See* N.Y. C.P.L § 440.10(2)(c) (mandating dismissal of claim if it could have been raised on direct review but was not).  Moreover, Petitioner has not overcome the procedural default by establishing cause and prejudice, or that the failure to consider the claim will result in miscarriage of justice, *i.e.*, that he is actually innocent. *Sweet*, 353 F.3d at 141.

Accordingly, I respectfully recommend finding this claim unexhausted and procedurally barred.

## 2.  Petitioner's Claim Fails on the Merits

Even if Petitioner's claim were exhausted, it still fails on the merits.  Applying AEDPA deference, the Court turns to whether the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, federal law." 28 U.S.C. § 2254(d)(1).  A criminal defendant possesses a constitutional right to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations omitted).  The Second Circuit has held that this principle includes expert witnesses. *See Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001).  However, "that right is not without

28

limits and 'may in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (internal citations omitted); *see also Connelly v. Senkowski*, No. 07-CV-4616(CBA), 2012 WL 5463915, at *7 (E.D.N.Y. Nov. 8, 2012) (*"Trial courts … enjoy 'wide latitude,' and federal courts must be 'reluctan[t] to impose constitutional constraints on ordinary evidentiary rulings by state trial courts.'"* (citing *Crane*, 476 U.S. at 689)).  A defendant's right to present expert testimony is "limited by the requirements of relevancy and by the trial court's traditional discretion to prevent prejudicial or confusing testimony." *Agard v. Portuondo*, 117 F.3d 696, 704-05 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000).

"In considering whether the exclusion of evidence violated a defendant's right to present a complete defense, we start with 'the propriety of the trial court's evidentiary ruling.'" *Hawkins*, 460 F.3d at 244 (quoting *Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003)).  If evidence was erroneously excluded, "we must look to 'whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Id.* (quoting *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996)) (internal quotations omitted).  However, where an evidentiary ruling was correct pursuant to a state evidentiary rule, "[w]e consider whether the evidentiary rule is 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" *Id.* (quoting *U.S. v. Scheffer*, 523 U.S. 303, 308 (1998)) (internal quotations omitted).  A state evidentiary rule will be deemed "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

### i.  The Propriety of the Trial Court's Evidentiary Ruling

The Court does not find that the trial court's preclusion of Petitioner's proffered expert was erroneous as a matter of New York evidentiary law.  Generally, "the admissibility and limits

of expert testimony lie primarily in the sound discretion of the trial court." *People v. Lee*, 96 N.Y.2d 157, 162 (2001).  "It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness." *Id.* (internal quotations omitted).  The trial court must determine "whether the proffered testimony 'would aid a lay jury in reaching a verdict.'" *Id.* (quoting *People v. Taylor*, 75 N.Y.2d 277, 288 (1990)); *see also LeGrand*, 8 N.Y.3d at 452 (which held that it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime," and that testimony is "(1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror.").  Moreover, "to the extent *LeGrand* has been understood to require courts to apply a strict two-part test that initially evaluates the strength of the corroborating evidence, it should instead be read as enumerating factors for trial courts to consider in determining whether expert testimony on eye-witness identification 'would aid a lay jury in reaching a verdict.'" *People v. McCullough*, 27 N.Y.3d 1158, 1161 (2016).

As discussed *supra*, Section I.B.4, in considering whether to admit expert testimony on factors that contribute to misidentification, the trial court considered the following factors: (1) five eyewitnesses unequivocally identified Petitioner at trial as the perpetrator and gunman; (2) the witnesses had unobstructed views of Petitioner on the night of the incident; (3) there was no evidence of collusion regarding the identifications of Petitioner; and (4) the evidence relating

to the pizza box procured from Canone's that was then brought to the residence.  Since there was

sufficient corroborating evidence connecting Petitioner to the crime, and there was nothing an

expert could have added that would have aided the jury, the Court cannot say that the trial court's

evidentiary ruling was erroneous as a matter of New York law. *See McCullough*, 27 N.Y.3d at

1159-61 (which held that the trial court did not abuse its discretion in precluding testimony from

an identification expert about certain factors that could have influenced an eyewitness's ability to

make a positive identification of defendant, on the basis that the eyewitness's testimony was

corroborated by another witness); *Young*, 7 N.Y.3d at 42 (2006) (which held that trial court did

not abuse its discretion in excluding expert testimony on subject of eyewitness identification

where identifications were "strongly corroborated."); *Lee*, 96 N.Y.2d at 163 (which held that trial

court did not abuse its discretion in denying defendant's motion for identification expert where

"the court was in a position to weigh the request against other relevant factors, such as the

centrality of the identification issue and the existence of corroborating evidence.").

Even if the trial court's preclusion of Petitioner's proffered expert was erroneous, it did

not rise to the level of constitutional error because, "in the context of this case, the admission of

the testimony would not have created an 'otherwise non-existent' reasonable doubt about the

petitioner's guilt." *Schriver*, 255 F.3d at 60 (quoting *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir.

2000)); *see also Agard*, 117 F.3d at 705 (which held that "[e]rroneous evidentiary rulings rarely

rise to the level of harm to this fundamental constitutional right.").  The Court agrees with both

the trial court and the Second Department that "there was sufficient corroborating evidence

connecting [Petitioner] to the crimes," *Redding*, 132 A.D.3d at 700-01, and further finds that

expert testimony on Petitioner's proposed topics relating to misidentification would not have

aided the jury.  Since the identifications of Petitioner were overwhelmingly strong, expert

testimony would likely not have changed the outcome of this case.  Thus, any purported error in the preclusion of expert testimony was harmless.

## ii. Infringement on a "Weighty Interest"

The trial court has not made a state evidentiary error, therefore, the Court considers whether the evidentiary rule was "arbitrary" or "infringed upon a weighty interest" of Petitioner. *Hawkins*, 460 F.3d at 244.  "In evaluating claims of violation of the right to present a complete defense, the Supreme Court has found the Constitution to be principally (but not always) concerned with state evidentiary rules leading to the 'blanket exclusion' … of categories of evidence when their application is 'arbitrary or disproportionate to the purposes the [rules] are designed to serve.'" *Wade v. Mantello*, 333 F.3d 51, 60 (2d Cir. 2003) (internal citations and quotations omitted).  Here, "[r]ather than involving the application of such a rule, the ruling at issue is one of those 'ordinary evidentiary rulings by state trial courts' concerning the admissibility of evidence, upon which the Court is 'traditional[ly] relucan[t] to impose constitutional constraints.'" *Id.* (quoting *Crane*, 476 U.S. at 690).  In such cases, "the Constitution leaves to the judges … 'wide latitude' to exclude evidence…" *Id.*

As discussed *supra*, I.B.4, the trial court engaged in a thoughtful and extensive analysis in evaluating the admissibility of the expert evidence.  Because this type of evidentiary ruling does not involve the "rigid application of state evidentiary rules prohibiting presentation of defense evidence," *Wade*, 333 F.3d at 57, it is not unconstitutionally arbitrary or disproportionate. *See DeVaugn v. Graham*, 14-CV-2322(NGG), 2017 WL 244837, at *14 (E.D.N.Y. Jan. 18, 2017) (which held that the trial court's exclusion of evidence pursuant to state rule that requires a court to balance the probative value against the risks of delay, prejudice, and confusion was not unconstitutionally arbitrary or disproportionate because it was "not the kind of

blanket exclusion rule that traditionally risks running afoul of the Constitution."); *Monk v. Bradt*, 778 F. Supp. 2d 352, 374 (W.D.N.Y. 2011) (same).

The state court's finding that the trial court properly precluded Petitioner's expert witness testimony was, therefore, not contrary to, nor an unreasonable application of, clearly established federal law. *See Paccione v. New York*, 353 F. Supp. 2d 358, 370 (E.D.N.Y. 2005) (which denied petitioner's claim that he was denied the right to present a defense by the trial court's preclusion of the eyewitness identification expert because "[u]nder established law, the need for an expert, based upon the defense proffer, was within the trial court's discretion. Petitioner points to no Supreme Court precedent to the contrary."); *Gil v. Mazzuca*, 91 F. Supp. 2d 586, 592 (S.D.N.Y. 2000) (which held that petitioner failed to demonstrate that trial court's decision to exclude expert testimony was "contrary to" or an "unreasonable application of" clearly established federal law where the petitioner failed to show that the expert testimony offered was "constitutionally mandated.").

Accordingly, I respectfully recommend denying Petitioner's claim that his right to present a defense under the Sixth Amendment was violated.

## B. Whether the Trial Court's Application of the *Frye* Standard Violated Petitioner's Right to Present Evidence

Petitioner claims that the New York *Frye* standard for the admission of scientific expert testimony is improper and violative of his rights to present evidence. (Petition at 7).  Petitioner maintains that the *Frye* standard should be replaced with the more "liberal" rule set forth in Rule 702 of the Federal Rules of Evidence, which adopted *Daubert*. (*Id.*; *see also* Docket No. 9-43 at 6-7).  This claim is without merit.

The instant record reflects that the trial court did not conduct a *Frye* hearing that led to the preclusion of Petitioner's expert.  In his motion for an identification expert, Petitioner

specifically requested that Dr. Penrod be permitted to testify "without a *Frye* inquiry being made." (Docket No. 9-5 at 7-10).  Furthermore, as discussed *supra*, Section I.B.4, in deciding whether to allow Petitioner's expert testimony, the trial court considered, *inter alia*, the identification testimony of the eyewitnesses, the substance of the proffered testimony, and whether expert testimony would aid the knowledge of the jurors.  Ultimately, the trial court precluded the expert testimony because it found that the identifications of Petitioner were sufficiently corroborated—not because it was deemed unaccepted in the scientific community under *Frye*.[18]  Moreover, Petitioner asserted on direct appeal that the trial court erred in denying his proposed expert without first conducting a *Frye* hearing. (Docket No. 9-38 at 27).  Thus, because the trial court did not apply *Frye* in its decision to preclude Petitioner's expert, the Court declines to consider any claim relating to its application.

Accordingly, I respectfully recommend that Petitioner's claim relating to New York's application of the *Frye* standard be denied.

## C.  Actual Innocence Claim

Petitioner claims that he is innocent. (Petition at 7).  Specifically, Petitioner maintains that the prevention of the expert scientific testimony of Dr. Penrod led to the jury finding him guilty of a crime he did not commit. (*Id.*).  Petitioner's claim of actual innocence fails on the merits.

A claim of actual innocence is a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  To obtain such relief, a petitioner must establish that, "in light of new

---

[18] Although at certain points, the trial court stated that certain factors have not been established as "scientifically accepted," (*See* Trial Tr. at 481), the court's overall analysis and reasoning for precluding the expert testimony did not hinge on this.

evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup*, *v. Delo*, 513 U.S. 298, 327 (1995)).  Moreover, "a gateway claim requires 'new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup*, 513 U.S. at 324).  Here, Petitioner does not present any newly discovered evidence showing that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327.  Instead, Petitioner simply restates his claim that the trial court erred in precluding his proposed expert testimony.

Accordingly, I respectfully recommend that Petitioner's claim of actual innocence be denied.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the Petition be denied in its entirety.  Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

The Clerk of Court is requested to mail a copy of this Report and Recommendation to the *pro se* Petitioner.

## V.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections.  If copies of this

Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   January 16, 2020
         White Plains, New York

RESPECTFULLY SUBMITTED,

JUDITH C. McCARTHY
United States Magistrate Judge

36